The next case for argument is No. 16, 1860 and 2313, United States v. Gilbert Lundstrom. We'll hear from counsel. Mr. Collins, is it? Good morning, sir. You may proceed. Thank you. Mr. Lundstrom, a 75-year-old retiree, appeals not only his conviction but also his sentence. I would like to start by pointing out that the district court erred in not entering a judgment of acquittal for Mr. Lundstrom based on an insufficiency of the evidence. There was a false premise that really ran throughout the government's case that Mr. Lundstrom, simply because he was the chief executive officer of Tier 1 Bank, was the person who was making all of the decisions. And that simply was . . . Well, there was more than an assumption. There was testimony that he was involved. Isn't that right? There was testimony that he was involved, obviously, in certain issues as the chief executive officer. But the two core elements of the government's case were an argument that the bank had delayed its ordering of appraisals. That was not a decision that Mr. Lundstrom was involved in. The ordering of appraisals, the administration of appraisals, was not something that, in his role as chief executive officer, he was involved in on a daily basis nor on any supervisory basis. There was testimony to the effect that he was involved in those decisions and supported them. Isn't that right? I would respectfully disagree, Judge, and I think a close examination of the testimony is important here. I think one of the things that we saw, particularly in the government's response, was a painting with a broad brush talking about testimony. The reality is that there was two cooperators for the government. The first testified that there was no meeting, no discussion of a plan to delay appraisals. At most, this cooperating witness talked about one conversation in which no statement in that conversation was attributed to Mr. Lundstrom. The second cooperating witness came in, and when the government asked about the plan to delay appraisals, said the first time he had heard of a plan was there in the courtroom. He was not somebody who testified to any detail about a conversation with Mr. Lundstrom, a directive from Mr. Lundstrom, a memo, a handwritten note, anything that would have suggested that Mr. Lundstrom ordered the delaying of appraisals. The delaying of appraisals was a key— Does he have to order the delay of appraisals? I mean, isn't this a conspiracy case, and all we need is evidence that he joined the conspiracy to delay the appraisals? One of the charges was conspiracy, Judge, but that obviously requires a couple things, knowledge and intent. I thought LAPHEN, L-A-P-H-E-N, LAPHEN? LAPHEN. Didn't he testify that your client agreed to this process of delaying the appraisals? Mr. LAPHEN testified generally about a plan at the bank to delay appraisals, but I think the details, Judge, matter here, and when it came to the details, Mr. LAPHEN included Mr. Lundstrom and his category of people he thought were responsible, but one witness's opinion, one witness's speculation is not the same as specific facts upon which a jury could rely, or a judge, for that matter, in deciding on a motion for an acquittal. All right. Well, didn't, is it Farnes, Farnes? Pardon, Judge? Farnes. Farnes. Didn't he prepare a spreadsheet showing the potential losses and capital deficit, and then didn't your client sort of conceal that from the board, and wouldn't that be evidence of joining this conspiracy? Judge, again, I would respectfully disagree with that assertion by the government. There's two things there. Mr. Lundstrom, in his role as chief executive officer, was dealing with an investment banking firm in New York in order to sell assets of the bank, in order to try to address what clearly was a problem going on at the bank, well-disclosed problems going on at the bank, and he asked for Gail Farnes to put together projections, different scenarios in the future, as to what effect the decline in the real estate market appraisals could have on the bank's financial condition. It was not the same as the work done by the CFO and the folks working for the CFO in terms of assessing the current financial condition of the bank, the as of a certain date condition of the bank. That was a process, that latter process was done pursuant to GAAP, very specific accounting standards that they needed to follow in order to assess what was the appropriate calculations. For example, one of the things that the government argued was that lowball offers on properties that the bank held should have been used to determine fair value. That's not consistent with the accounting standards under GAAP. They require fair value, an orderly exchange between two market participants. That's not a vulture sale. So there was two really separate things, Judge, and I think that the government conflated those well in its presentation, but they're really two separate things. Let me give you my impression. After reading your briefs, before I read the government brief, you present Mr. Lundstrom as, these are my words, I'm overstating it just for emphasis, Lundstrom as being someone's hapless bystander, sort of like Lincoln, Nebraska's answer to Richard Fold of Lehman Brothers. I didn't really know what was going on. My help was running me into the ground. On the other hand, the government points him out as being the mover and the shaker in building this small organization into a larger organization. What is the truth? The truth? I thought I jotted this down, just irrelevant. Was he one of, he used to know, especially small-town bankers were known as 363 bankers, taking in money at 3%, loaning it out at 6%, and being on the golf course at 3%. Was that the type of golfer he was? I would not describe Mr. Lundstrom as a bystander at this bank, but the detail matters. Mr. Lundstrom, in his role as Chief Executive Officer, was focused on certain things, certain aspects of the bank's operations, including trying to sell assets of the bank in order to address the financial condition the bank was in. Separate from that. What role did he play in getting that bank into that financial problem? Judge, I would submit that, quite frankly, that's irrelevant, and for this reason, Judge, respectfully. The government talked about the fact that this bank changed its strategy, changed its strategy from being a traditional lender with home mortgages to a more aggressive strategy after its capital raise by going public. That strategy obviously did not work out well, but by no means was Tier 1 Bank the only one who suffered from a bad financial strategy. Having a bad strategy, to the extent that Mr. Lundstrom was involved in developing that strategy, was not the crime that was charged here, and it's certainly not the crime for which he was found guilty. The crime for which he was found guilty was this so-called plan to delay appraisals and the so-called extensions of financing to certain bowers. And just staying on that for a moment, Judge, Mr. Lundstrom was the last signatory on a long list of folks at the bank who negotiated these extensions of credit. The government, in its response and at trial, referred to them as Lundstrom decisions. One only needs to look at the evidence to understand that these were not, quote, Lundstrom decisions, but in fact originated with a lower-level employee who was dealing with that bower, negotiating what that extension would be, securing additional collateral, and then bringing it up to superiors, who then advanced it through written documentations, ultimately to the board, where each director would receive a memorandum describing what the extension should involve. Each of them approved it. Mr. Lundstrom, in his role as chief executive officer and chairman of the board, was the last signatory on it. To characterize that as a one-person decision is not consistent with the record. Judge, I don't think that I'm not trying to suggest that Mr. Lundstrom was on the golf course at 3 o'clock. Far from it. He was very involved in a very difficult situation at the bank. But as it relates to the two court sets of conduct that the government pointed to as criminal acts, he was not involved. He was not making those specific decisions. And the suggestions that he were are not supported by a detailed look at the record. Well, then, of course, the government, I noticed, I marked this down when I read the briefs on page 39, referring to the evidence, sufficiency or lack thereof. In any event, Lundstrom aired these explanations at trial, and the jury rejected them. And, of course, your argument is that the evidence just didn't justify the jury's verdict, obviously. But to what extent can we get into that? Well, sure, Judge. I think that you are allowed to obviously look at the record, and I understand the standard here is to draw inferences in the government's favor, draw credibility inferences in the government's favor. I understand the standard. But this will not be the first case, by any means, that this court has decided that the district court erred in not entering an acquittal, in part because simply because the defendant was associated with others who were committing criminal conduct is not enough of a basis to sustain a conviction. There were two cases, Kasperson and Rye, both of which we cited in our briefs, that dealt with this very issue. Simply because somebody is around others, associated with others, in what turns out to be a criminal operation, obviously that bleeds that guilt. It's very difficult for a jury to understand the distinctions. It's difficult for all of us to understand those distinctions. But it's our job, and it certainly was the district court's job, to look at a detailed level at the evidence and determine that Mr. Lundstrom, in his role, was simply associated with others who were making bad decisions for the bank. Can I go back to the spreadsheet? You suggested that it wasn't a gap assessment. Correct me if I'm wrong. My understanding of the spreadsheet is the sort of, if we were to go get appraisals now, this is where we would be. Do I understand that correctly? Actually, Judge, I think it depends upon the perspectives of those involved. When Mr. Lundstrom asked for this to be created, it was consistent with what was being done with Sandler O'Neill, who was an investment firm. It was talking about how bad could things get? What's a best-case scenario? What's a moderate-case scenario? What's a worst-case scenario? It was projecting, as part of the financial analysis, to essentially sell assets of the bank. When one of the employees who was involved in helping to prepare that chart changed the title, changed the title of that report, and put down that it was involving when appraisals would be ordered, that was not a Lundstrom decision. That was not a Lundstrom directive. That changed the nature of the information and created a document that Mr. Lundstrom did not direct. And, Judge, I know you asked before about . . . Wait a minute. Didn't Mr. Lundstrom have a role in making sure that that didn't reach the board? Judge, I respectfully disagree with that. Mr. Lundstrom was the one who had it presented to the board. There was one witness who suggested that a now-deceased person was the one who wanted it to be before the board. But Mr. Lundstrom was the one who brought that material before the board, not once, Judge, but twice. Twice. And it was the full board, the independent directors, people who were very well-respected in the community, folks that had long industry recognition in terms of running banks. That's information that Mr. Lundstrom presented to the board. He also presented it to the outside third-party consultant. Mr. Lundstrom was not trying to hide this document, Judge. What about at least the argument in the government brief that he lied about whether he was seeking TARP funds? Judge, I would like to talk about that specifically. Everybody agreed that the slide that was presented at the shareholders' meeting was true, what it said. And the reason it was phrased the way it was was based on advice provided by counsel who were aware that the government had directives out in the market to banks telling people that were applying for TARP funds that it's to remain confidential. The government had a specific advisory telling folks that if we decline your request for TARP funds, that's something that we will not publicly disclose. They didn't want it disclosed. They didn't want further panic. That was a government position. And what the lawyers who Mr. Lundstrom consulted with prior to that shareholders' meeting knew and said was we're not going to disclose that the bank has applied for TARP funds. And so that's why that slide, not written by Mr. Lundstrom, but certainly presented by Mr. Lundstrom, said what it said. There was good reason not to share that information. But whether it's that judge, whether it's discussion of a corporate governance report, whether it's discussion about these spreadsheets, all of that was to the sidelines of what the core conduct in this case was, delaying appraisals and extending additional financing to borrowers. Those were the two sets of conduct that drove the bank's ultimately reported financial condition. And those were things that Mr. Lundstrom was simply not involved in, in the way that the government now characterizes. Could I ask another question about the spreadsheet? As I understand it, it was a document in which the bank estimated losses in best case or expected case or worst case situations. Isn't that correct? Yes, sir. Was there any difference between what appeared as the expected case on any of these loans and what was reported with respect to the condition of the bank to the public with respect to those loans?  Or was there some other number that was disclosed? Yes, Judge. It's important. First of all, the bank's reported financial condition was not consistent with the projections that were on the spreadsheet. Okay. Not even the expected one, Judge. No bones about it. However, it's important to understand that we're talking about two wholly separate lanes. One is the preparation consistent with GAAP done by the CFO and his staff, where they do the detailed analysis of the bank's condition and put together essentially a draft statement for the C-suite to review. That's the process for the C-suite, for the Chief Executive Officer, the Chief Operating Officer, for those folks to take a look at that draft before it's finalized.  That is the GAAP-compliant process where the information goes out to the public. That's what every public corporation does. This internal kind of estimate as to how bad things can be so that they can properly work with the consultant and try to sell the assets was a wholly separate exercise. I understand, but it had an expected case component, right? It did, Judge. The question I have is to what extent, if at all, does this expected case component comport with what was reported in public as far as the bank was concerned having to do with its condition? Subsequent to the bank's report of its condition, obviously, things continued to worsen for the bank. At the point that the bank was now in a position to report . . . What's the correspondence, if any, between this expected case, which is what the bank thought internally, evidence of what they thought internally, right, and what they were telling other people with respect to these loans? Judge, the timeline, I think, becomes important in terms of what is being reported to the public as of a particular date. That's the GAAP-compliant exercise in terms of the reports. How long was that?  It's reported quarterly, Judge. In fact, one of the charges here was securities fraud based on a particular quarterly report issued by the bank. The projections in terms of the spreadsheet that was prepared by Mr. Furness and Mr. Langford talked about future, how can this go? And to answer your question directly, as the timeline progresses, after the sharing of information to the public that was meant to be GAAP-compliant, things got worse. Things got worse for this bank. And without doubt, the situation of the bank worsened fairly quickly. That's really, Judge, not in dispute. But whether that's the strategy that was chosen, whether that was the market, whether that was the truly unique financial crisis that the whole nation was experiencing, there's a lot of things that went towards the fact that the bank's condition worsened the way it did. What Mr. Lundstrom, what all the executives at the bank were required to do was determine what the bank's financial condition was as of a certain date in a way that was GAAP-compliant. That was a process that was put together by the CFO and his staff. They signed certifications to Mr. Lundstrom telling him that the information they put together was as true and as accurate as it could be. And Mr. Lundstrom relied upon those certifications. He was not getting into the details of the preparation of these statements and signed the certification. The government wants to characterize all of this as Mr. Lundstrom doing each of these tasks, and he simply didn't. And that's why I want to turn, if I may, to the bill in particular's issue, because that was a significant point for the defense in this case. The government alleged that Mr. Lundstrom was involved in adjusting those financial statements, and the defense, in order to prepare for that, sought information from the government as to what it was. The government said, we're not entitled to a bill in particular because we've identified hot documents, we've given SEC testimony. None of that, none of that matched with what the government eventually presented at trial. And they did it in a way, through a summary witness, where there was going to be no 3,500 material provided to us to give us any notice whatsoever that that's what the government was going to rely upon. I see, Judge, that I have about 45 seconds left, and I know there's a lot to this case. I'd like to reserve a little bit of time for rebuttal, if I may. Very well. Thank you. Good morning. Mr. Lieberman? Mr. Lieberman, good morning, Your Honors. You may proceed. May it please the Court, Dave Lieberman for the United States. The defense has once again tried to portray our prosecution as being all about appraisals. That is wrong. Mr. Lundstrom and the other executives were charged and convicted for lying to regulators, for lying to shareholders, specifically misrepresenting the value of Tier 1's assets on public financial reports, misrepresenting their activities in complying with regulatory duties that they agreed to. And the trial evidence, this is going to the sufficiency claim, placed Mr. Lundstrom squarely in that scheme. So the Court has referenced some of the testimony. There are two witnesses that I would like to mention. Mr. Latham, the Chief Operating Officer, transcript page 394 through 396. He says Lundstrom was part of this process, the part of the process to delay the taking of losses, one of which, one component of which, was the decision to delay appraisals. Question, did Mr. Lundstrom agree with the plan? Answer from Latham, yes, he did. The second piece of testimony that I would like to reference is testimony from Lankford. Lankford talks about a conversation that he has in the parking lot with Mr. Furness in February of 2009. Furness tells Lankford, Tier 1 cannot afford any more write-downs, parlance for losses. Furness relays the directive to stop appraisals. And then Furness tells Lankford, it is not my plan. It is coming from the corner offices. Who are the individuals that sit above Mr. Furness in the organizational chart? Mr. Latham and Mr. Lundstrom. The second critical bucket of evidence that the Court has been discussing are the spreadsheets. And at trial, Mr. Collins is correct, Mr. Lundstrom got up on the stand and said, everybody is misunderstanding these spreadsheets. They were about discussions that I was having with New York investment consultants. Just procedurally, that was a claim raised in the defense. The government's case stands on its own for sufficiency. And the government presented overwhelming evidence that Mr. Lundstrom's defense on these spreadsheets was false. There is an e-mail from Mr. Furness in April of 2009. It's Trial Exhibit 247. Contemporaneous e-mail when he's preparing these spreadsheets, which tells us, what are these spreadsheets supposed to be for? I continue to have discussions with Lundstrom regarding reserves. And remember the testimony about reserves. That is the money that the bank needs to cover its losses on its loan portfolio. I continue to have discussions with Lundstrom about reserves. We really need to calculate what we will likely need in the next six months. That is an internal e-mail from Lundstrom, excuse me, from Furness, admitted at trial, discussing his conversations with Lundstrom. The jury heard testimony from Lathan, from Langford, from Francis, saying that this was not about gap procedures. This was not about that separate process. This was about an internal document that Mr. Lundstrom directed Furness to prepare to quantify the losses in the loan portfolio that had never been reported on the books, that had never been reported on public financial statements. And Mr. Furness says $36 million to $114 million. That's his calculation. If the jury needed any more evidence to doubt Mr. Lundstrom's explanation, the government provided it. The spreadsheet's title, Potential Reserve Additions Needed Due to the Timing of New Appraisals. That says it right there. It says exactly what Furness's e-mail said. This is about reserves. This is about money that we have not reported to cover our losses on these loans. In Mr. Lundstrom's only defense when we asked him, didn't you see the title, I didn't notice it when he first received it. Look at Mr. Lathan's testimony, page 648 of the transcript. He says, I came up with the story about the New York consultants. I gave it to Mr. Lundstrom and suggested that he use it. Finally, on the spreadsheets, the government presented many instances, documented many instances, where Lundstrom tried to conceal the spreadsheets from other individuals at the bank and outside the bank. Lundstrom concealed it from the independent accountant, KPMG, transcript page 658. KPMG later resigns, citing the reason we didn't get the spreadsheet. Lundstrom doesn't give it to the OTS examiner, transcript page 1584. When the examiner inquires, Lundstrom says, that's all we got. Lundstrom tried to conceal it from the board of directors, but Mr. Furness insisted on presenting it. And I know Mr. Collins disagrees with the government's interpretation. Here was the testimony. This is from Langford. Mr. Furness told me that he had met with resistance, that Mr. Lundstrom did not think it was necessary or appropriate to present these spreadsheets to the board. Mr. Furness said that he insisted, and he was absolutely intending to present it. So that is additional evidence of concealment. Finally, transcript page 1377. Lundstrom directs Judith Klinkman, the board secretary, to remove mention of Furness's presentation from the meeting minutes. Why is that? Because the bank examiners under the supervisory agreement were reviewing the OTS, excuse me, the Tier 1 meeting minutes to ensure compliance with the supervisory agreement. The last bucket of evidence on this sufficiency claim that I would like to disagree with opposing counsel on is that the government cited many instances where Lundstrom was doing something internally at the bank and telling regulators, telling shareholders something different. Mr. Collins referenced the loans. I'll give to Town Creek, excuse me, Town Vistas, Canyon Creek. It is true that lower-level employees had recommended loan extensions or modifications, but it's important to look at the procedures and the sequence in which this came about. The bank examiners told Tier 1, these are big projects, $20 million, $30 million loans. They have stale appraisals. We would like to see a new appraisal. Lundstrom, who signed the supervisory agreement, so he knows OTS's concerns, Lundstrom, Lathan, and the other executives approve these loan modifications. They approve additional financing. No appraisal is ever ordered. And then when Lundstrom signs the tracking reports that tell the examiners how the bank is doing on their progress and complying with their regulatory duties, with these loans, Lundstrom says, your concern is satisfied. Look at the May 2009 shareholder meeting. Lundstrom learns that the bank regulators are going to deny his application for TARP. He withdraws it before the formal denial. He tells his shareholders face-to-face then, Tier 1 is not seeking to participate in TARP. That was a misrepresentation. And this morning, the defense says, well, that's what the lawyers told me. That was not the testimony even from Mr. Lundstrom at trial, which, again, doesn't go to sufficiency. But I'll point it out. At trial, Mr. Lundstrom said his lawyers, he consulted with his lawyers, and they told him we don't need to disclose the fact of a TARP application or the withdrawal of a TARP application. There was absolutely no testimony that any lawyer approved the false and misleading statement that Mr. Lundstrom directly made to shareholders in May of 2009, giving them the impression that the bank didn't need TARP funding. That was false. So line up these three buckets of evidence, the conspirator statements, the spreadsheet, which the government presented overwhelming evidence, was not about GAAP, not was about accounting, but was a second set of hidden books to quantify these hidden losses. And let's talk about the first bucket for just a second. Yes. The first one was one person saying he agreed to do this, and then the second one was this came from the corner office, presumably Mr. Lundstrom's office. Yes. Both of those are pretty conclusory. There was no foundation laid. There was no, well, how do you know that he agreed to this? Did it occur at a meeting? Did he send an email? And that was sort of my concern about that. And interestingly, there was no follow-up questions from, I don't know if it was from you or the AUSA who handled it, but they seemed a little conclusive with no foundation. So for Mr. Lathan, the answer is he said he had a conversation with Mr. Lundstrom. He said he didn't have meetings, there were no meetings, but he had a conversation. Now, the problem with the February 2009 meeting about Furness and Langford is that the information was coming from Furness, and Furness was deceased at the time of trial. But I would contrast what Furness says, excuse me, the testimony from Langford about this meeting, in that Exhibit 247, that contemporaneous email from Furness to Langford where he says, hey, I continue to have discussions with Lundstrom regarding reserves, which, again, reserves is about capital that the bank needs to cover losses. And I go back to my main point, which there's no disagreement on. The spreadsheets documented $36 million to $114 million in hidden losses, none of which ever made, and this was in April, so none of which ever made it on to any financial report, second quarter or beyond, until November when the bank starts announcing it has recovered losses. So I think the answer to your question is read the statements in context, in context with the other evidence that the government presented about the spreadsheets, in context with the email that we have from Furness saying what are these spreadsheets about. The second, if there are no further questions about sufficiency or about any of the governments, I'll move on to the Bill of Particulars. The government's position on the indictment, Paragraph 37 of the indictment, does it adequately inform Lundstrom of what that allegation was? We say yes. First of all, it was one of 15 manner and means of the conspiracy. It wasn't the linchpin of the government's case, and it informed the defense that the bank filed a second quarter 2009 financial report, and Mr. Lundstrom and his co-conspirators adjusted the capital numbers to show compliance with their capital threshold. That on itself is sufficient for purposes of a Bill of Particulars. It says here's the report, here's what you lied about. What the defense is objecting to is unfair surprise as to how the government proved that allegation. We proved it with an email exchange between Langford and Furness, 289. We elicited testimony from an accountant regarding improper adjustments based on his review of Tier 1's internal documents, all of which were disclosed. That goes to the manner of how the government proved up its case. That's not a Bill of Particulars objection, and Judge Gerrard correctly noted this when he said in denying relief at post-trial, if you were surprised, if you were confused, just ask for continuance. And to the extent that there has been the suggestion that our trial team was trying to hide the ball on this, the government categorically rejects that. The defense, if you look at the original Bill of Particulars motion, Document 35, it wasn't about Paragraph 37. The defense claimed that every paragraph, pretty much every paragraph in our indictment was flawed. And that's what the magistrate judge denied that motion, and in doing so, cited all the efforts that the government tried to take to communicate to the defense the nature of these allegations. We have a detailed indictment. We offered categorized, searchable electronic discovery. We had early production of 302 witness statements. And we also pulled out from our discovery and marked 400 documents that we linked to specific allegations in the indictment. And we pulled out a document. It was later admitted at trial, Exhibit 367A through E, that said this relates to Paragraph 37. And what was that document? It was the internal numbers that Tier 1 had run, showing that they were going to have a capital shortfall. And the document has two sets of handwritten notations on it. And there's no dispute about who made those notations with the number. There are a bunch of numbers next to them. One was Mr. Witkiewicz, and the other was Mr. Lundstrom. And so our trial team's additional efforts pointed the defense to the way. And finally, at the- If you were so forthcoming with all your evidence, why did you object to the Bill of Particulars request? Because, Your Honor, if the court goes back and looks at the Bill of Particulars, it was this omnibus giant request asking for details on every single additional, every paragraph. And our view was this court has said, and every court has said, the Bill of Particulars is not a roadmap. It's not a discovery device. It is not a device for the defense to get a preview of how the government is going to prove up its case at trial. If the defense had come and just with a narrow request, and that is actually in our discovery letters, if you have any concerns about specific allegations, if they'd come to us and said specifically paragraph 37, we need help, our trial team would have endeavored to accommodate that request. But the requests here were overbroad. They were claiming everything, practically everything in the indictment was overbroad, vague, and conclusory. And so had they narrowed the request, we probably wouldn't be here. So the defense has raised a number of other objections that Mr. Collins has not referenced this morning, to evidentiary objections, to jury instructions, to sentencing determinations, the amount of loss, as well as restitution. I don't want to open any doors if I don't have to. If the court— I have a door I'd like to open. Okay, yes, I'll walk through it, Your Honor. Why is the loss for calculating the guidelines range different from and so much larger than the loss calculated for restitution purposes? So the loss is a reasonable estimate of loss. And so we use what the guidelines refer to as the modified recessionary method. And then restitution refers to actual loss, that we have to point to actual loss by an actual shareholder. And that's why the district court, the most thorough district judges I've ever seen sort of charts this out, says we're using the modified recessionary method for the loss, and says I need to consult actual shareholder data. People that actually came in and went out during the fraud period. That was the Wray decision? Your Honor, I'm sorry. I don't remember that case. Class action? Yeah, the district court was— Class action amount, right? Yeah, the court was consulting data from the Tier 1 securities fraud class actions. And the court walks through in very fine detail how it calculates loss. The parties had extensive litigation on this below. I know. And we both called our experts, and the district court credited the government's expert who said, listen, Tier 1's price during the fraud period was matching the S&P Regional Bank Index, which means it's a good measure of general market forces. When does the price fall? When does the bottom out? November of 2009, when the fraud is disclosed on the market. All of a sudden, over 70%— The methods used were independently valid. Yes. So did you read that 28J letter? The case that came in, generally speaking, the numbers should be the same? Yes, Your Honor. So I haven't even discussed that. I read it last night with the trial team, so I'll follow up with a formal 28J letter from the government. But as I understand the Stein case, there were two issues. It was this factual causation. Did the shareholders rely on the fraud? And then an argument about proximate causation. And I actually don't think that these were adequately raised in the briefs to this court. I don't think these arguments were adequately raised in the district court, so I'm not sure that they're even before us. But the key thing in the Stein case, that case was about three press releases, false press releases that the defendant sent out citing bogus sales. The court goes out of its way to say we could reach a different decision with stronger circumstantial evidence that shareholders were relying on the misstatements coming from the defendant. In this case, Mr. Lundstrom's misrepresentations were far more significant. He was talking about Tier 1's viability as a financial institution. We have strong capital levels. We are exceeding our supervisory requirements. We are exceeding our capital ratios. And Mr. Lundstrom made those representations not in a press release. Well, he did make them in press releases. But he first made them in public financial reports, which he signed and certified as true. He also certified that he had provided this information to the independent auditors, KPMG. They had looked up the numbers. And finally, Mr. Lundstrom makes this representation, these types of representations, face-to-face to shareholders at the 2009 shareholder meeting. Second big point on Stein is we actually did connect the dots. So, first of all, we know that investors are coming in during the fraud period. They're presumably relying on something to purchase Tier 1 stock. And we think the reasonable inference is they're looking at public reports, how healthy is this company. And that's bolstered by trial testimony from Bruce Hudson and Stephen Gray at trial. That's what we did. And really some heartbreaking 302 witness statements. This is at documentary 213. Ordinary Nebraskans, they read something in the newspaper about Tier 1's financial reports. They look it up on the Internet. They then move their retirement savings in there, and they lose substantial portions. But they were saying, we looked at, we are hearing news reports about Tier 1. We are looking at the public reports. On the proximate cause, was there some other intervening unforeseeable event that caused a decline in Tier 1 stock price? In Stein, it was some other investors were coming in on short selling. Our trial team asked the defense expert, how do you explain the 70%-plus price drop in November of 2009? Response, this is at sentencing transcript 122. I really don't have an opinion with respect to that. We followed up. Could it be that the stock price declined when the market learned that Tier 1 was revising its prior financial reports to $120 million in loss? Response, I was not asked to look at that. Sentencing transcript 122. So the defense expert could not offer up another explanation that intervening unforeseeable cause that prompted this decline. I think the district court did an excellent job of rooting all of this out at sentencing, gave a thorough explanation. The court's findings are not clearly erroneous upon appeal. Did the district court basically apply the same analysis that's used in shareholder class actions? Fraud in the market, therefore we collect? So the district court had two explanations as to, at least I'll go to restitution, had two explanations. First, it said, based on the evidence that I've seen, Mr. Lundstrom's fraud brought all these individuals into the market. So he is responsible for their losses, even if some are resulting from other causes. He took that risk. His second explanation was, based on the evidence before me, I don't see any other forces that caused the decline. So unless there are any further questions about this or any of the other questions, the government asks that the court affirm on all bases. Very well. Thank you. Thank you, Your Honor. I know I don't have much time. That is the point. There was no foundation. These are witnesses who are essentially offering their opinions, and there's no facts. There's no statement attributed to Mr. Lundstrom, not even a nod of a head attributed to Mr. Lundstrom. Now, as to the bill of particulars issue, there was just a statement made that an accountant was called, all of which was disclosed. Not the case. Have we ever reversed on the denial of a bill of particulars? I think the appropriate remedy here is to allow for a new trial, one that doesn't involve unfair surprise. Are there any cases where we've done that? Judge, I have not seen any in the Eighth Circuit. I know in the Second Circuit case that I provided, it talked about the fact that some key events were shrouded in mystery. That's the case here as it relates to what adjustment was. And there, the Second Circuit said, you know, defense counsel was left unguided, and that was important to them. This is even worse because the government told us it was, A, Witkiewicz's adjustments, and then at trial it became, B, Lankford's adjustments. It was a total surprise. It was a total head fake to say that the discovery is replete with information that allows us to prepare. The discovery led us in one direction, and then they changed. That's the unfair surprise. That is why the relief, I believe, is appropriate. The idea that an accountant was disclosed is not the case. He was disclosed as a summary witness. No 3500 material was provided. And on the issue of saying that there was no more specific request, that is not the case. There was a number of requests for that specific information as the adjustments. And we were told one thing, and they did another. I think that the decision in Stein, the recent decision, is very important as it relates to loss. There shouldn't be such a huge delta between what the court uses for applying the guidelines and then the actual loss. We did raise that before the district court. We pointed out that using the estimate methodology included all outstanding shares, and that's what the judge decided to do, was use all outstanding shares as part of the calculation to produce such a huge loss figure. In Stein, that court used just the shares that were purchased during a particular period, and even that wasn't appropriate because there was no causation. There was no reliance shown. So we have a situation which produced a gross estimate. Your time is up, and I guess we'll have to ask you to stop. Thank you, Judge. We appreciate the arguments on both sides. The case is submitted. The voluminous record, which we will study carefully, and the case is now submitted. Thank you.